**AFFIRMED and Opinion Filed August 5, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-01236-CR**

**AMBER RENEE GUYGER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F18-00737-Q**

## OPINION

Before Chief Justice Burns, and Justices Myers and Partida-Kipness
Opinion by Chief Justice Burns

Amber Renee Guyger was convicted of murdering Botham Jean and sentenced by the jury to ten years' imprisonment. In two issues, Guyger argues the evidence is legally insufficient to support her murder conviction and second, and in the alternative, this Court should acquit her of murder, convict her of criminally negligent homicide, and remand for a new hearing on punishment. We affirm the trial court's judgment.

In July 2018, Guyger moved to the Southside Flats Apartments in Dallas where she lived alone in apartment 1378. Residents of the apartment complex use

key fobs rather than traditional keys to unlock their apartment doors. The complex has a multilevel garage with entrances on each floor. Each hallway entrance lacks any placard or other indicator showing which floor of the complex the hallway accesses or which floor of the garage can be accessed by exiting the hallway.

On September 6, 2018, Guyger, a Dallas police officer, left work at 9:33 p.m. Guyger and her partner Martin Rivera exchanged texts about getting together later that evening. Rivera called Guyger at 9:38 p.m., and she was on the phone with him at 9:46 p.m. when she pulled into the parking garage at her apartment complex. Guyger continued speaking to Rivera until almost 10:00 p.m.

Guyger testified that, when she parked in the garage, she believed she was on the third floor. She did not notice the garage roofline on the fourth floor was different from the roofline on the third floor. As Guyger walked down the hallway on the fourth floor, she believed she was on the third floor where her apartment was located. When she reached apartment 1478, she believed she was outside her own apartment. Guyger testified that, while she was standing outside the apartment, she heard loud shuffling, like someone was walking inside. Guyger admitted that, before she opened the door, she concluded there was a threat inside the apartment; however, she did not take a position of cover and concealment or call for backup.

The door was ajar and not latched closed. Guyger turned her key fob in the lock, which opened the door farther. Using her left arm, Guyger pushed open the

2

door.  Guyger testified these events occurred in the span of two seconds.  There was no light on inside the apartment, but Guyger said she "heard moving around inside" and was "scared to death."

Guyger testified she dropped her police vest and other equipment in front of the door to keep the door propped open.  Looking into the apartment, which had the same floor plan as her apartment, she saw a "silhouette figure" standing in the back of the apartment.  From where she was standing near the doorway, she could not see the figure's hands.  Guyger pulled her weapon and yelled, "Let me see your hands. Let me see your hands."  According to Guyger, the figure walked towards her at a fast pace, yelling "hey, hey, hey" in "an aggressive voice."  Guyger was focused only on the figure—Botham Jean, the lawful inhabitant of apartment 1478—and she testified she believed he was going to kill her.  Guyger fired two shots at Jean, intending, in her words, "to kill him."  One round struck the south wall of Jean's apartment, and the other struck Jean in the chest.  Jean fell to the ground with his feet pointed away from the couch on which he had been sitting and his head close to an ottoman and couch.

When Guyger walked into the kitchen, she saw the interior of the apartment and realized she was not in her apartment.  Confused, Guyger knelt next to Jean. She knew she had shot him, but she did not know where the bullet hit him.  At 9:59 p.m., Guyger called 911 with the phone in her right hand.  She testified that, at the

3

same time, she began chest compressions on Jean with her left hand. She identified herself as a police officer to the 911 operator, requested an "officer assist," and repeatedly told the operator she thought she had shot someone in what she believed was her apartment. She did not know where she was and went out in the hallway to look at the apartment number so she could provide that information to the operator. While on the phone with the operator, Guyger performed a sternum rub, which she had seen paramedics perform to wake up someone who is unconscious. From the five-minute 911 recording, the jury heard Guyger say twenty times she thought she was in her own apartment. They also heard her say, "stay with me, Bud," several times, "I f***ed up," and "I'm gonna lose my job."

In response to Guyger's "officer assist" call, officers Keenan Blair and Michael Lee were the first to arrive at Jean's apartment. Guyger directed the officers into apartment 1478. As reflected in body camera video, Lee instructed Guyger to move away from Jean as he and then Blair performed CPR on Jean, who was alive but unconscious. Lee's body camera video showed Jean bleeding from a gunshot wound and Guyger saying repeatedly that she had shot Jean.

When paramedic John Farleigh arrived at Jean's apartment at 10:08 p.m., Dallas police officers were performing CPR on Jean, but he had no pulse and was not breathing. The paramedics took over first aid from the officers and transported Jean to Baylor Medical Center, where he died without regaining consciousness.

4

Detective Eduardo Ibarra testified that a blood test was performed on Guyger at approximately 3:00 a.m. No drugs or alcohol were detected in Guyger's blood. Ibarra also seized all parts of Guyger's uniform for lab analysis of any biological evidence on the uniform. No blood was found on her uniform, and none of the latex gloves Guyger carried while on duty that day had been used.

Detective Dale Richardson testified that he arrived on the scene around 11:10 p.m. and initially met with Ibarra. After obtaining a search warrant, Richardson located a set of keys hanging from the door that he believed were Guyger's. The jury saw video evidence demonstrating how the locking mechanism on the doors worked. A small blinking red light lit up when the wrong fob was inserted, but a small blinking green light lit up and the door electronically unlocked when the correct fob was inserted. Video of Richardson and Ibarra comparing use of Guyger's key and Jean's key was also played, which demonstrated that when inserted into the door of apartment 1478, Guyger's key generated a red light and would not activate the lock, but Jean's key generated a green light and made a "whirring sound" while it unlocked the door.

The Texas Rangers took over the investigation from the Dallas Police Department the day after the shooting, met with Ibarra and Richardson, and reviewed the evidence collected by DPD. Texas Ranger David Armstrong characterized the

5

layout of the apartment complex as "confusing" and discovered that about 23% of residents who lived on the third and fourth floors and 15% of residents in the entire building had, at some point, put their key fob in the wrong door. Armstrong testified residents gave numerous reasons why they realized they were in the wrong place: the red blinking light on the door lock, nearby decorations indicating a different resident's apartment, or an incorrect apartment number. In the same vein, several residents testified about having gone to the wrong floor or apartment.

April Kendrick, a supervisor of the firearm and tool mark unit at the Southwestern Institute of Forensic Sciences, confirmed the shell casings found in Jean's apartment were fired from Guyger's nine millimeter pistol. Kendrick also testified that the bullet trajectory indicated Jean may have been bent over and rising from the couch when he was shot. Testimony from the medical examiner, Dr. Chester Gwin, revealed that Jean died from the single gunshot to his chest. The bullet entered his chest just above his nipple and traveled on a steep trajectory downward through his left lung, heart, diaphragm, stomach, and intestine, stopping in a muscle in his left abdomen near his spine. Dr. Gwin explained the bullet's path indicated that either the shooter was standing over Jean and shooting down, or Jean was lying down or bent forward, in the process of getting up from the couch or ducking. Guyger could not explain the inconsistency between her testimony that Jean was standing straight up and moving toward her when she shot him and the

6

bullet trajectory evidence indicating Jean was shot from above or while in the process of getting up or ducking.

Texas Ranger Michael Adcock testified about the trajectory of the bullet that hit the back wall in Jean's apartment. The flight path of that bullet indicated it had been fired from the doorway, which was also confirmed by gunshot residue recovered on the doorframe. At the conclusion of the evidence, the jury found Guyger guilty of murder as charged in the indictment. This appeal followed.

In her first issue, Guyger argues the evidence is legally insufficient to prove beyond a reasonable doubt that she committed murder. Specifically, Guyger argues "(1) through mistake, Guyger formed a reasonable belief about a matter of fact— that she entered her apartment and there was an intruder inside—and (2) her mistaken belief negated the culpability for [m]urder because although she intentionally and knowingly caused Jean's death, she had the right to act in deadly force in self-defense since her belief that deadly force was immediately necessary was reasonable under the circumstances."

I.      Legal Sufficiency

We review a challenge to the sufficiency of the evidence on a criminal offense for which the State has the burden of proof under the single sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). Under this standard, "the relevant question is

7

whether, after viewing the evidence in the light most favorable to the verdict, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319) (emphasis in original). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "This standard accounts for the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Clayton*, 235 S.W.3d at 778 (quoting *Jackson*, 443 U.S. at 319). "Therefore, in analyzing legal sufficiency, we 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)).

Here, Guyger maintains that the evidence is legally insufficient to show she committed murder in one of the ways set forth in section 19.02 of the Texas Penal Code, which provides in relevant part that a person commits murder if she

> (1) intentionally or knowingly causes the death of an individual; [or]
>
> (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual . . . .

TEX. PEN. CODE § 19.02(b)(1), (2). The indictment charged Guyger alternatively with both theories, both theories were submitted to the jury, and the jury returned a

8

guilty verdict that did not specify which theory it relied upon. Evidentiary support for either theory will therefore support the verdict. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) ("When a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands 'if the evidence is sufficient to support a finding under any of the theories submitted.'") (quoting *Kitchens v. State*, 823 S.W.3d 256, 258–59 (Tex. Crim. App. 1991)); *Williams v. State*, 473 S.W.3d 319, 324 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("When the charge authorizes the jury to convict the defendant on more than one theory, as it did in this case, the verdict of guilt will be upheld if the evidence is sufficient on any theory authorized by the jury charge."); *see London v. State*, 325 S.W.3d 197, 206–07 (Tex. App.—Dallas 2008, pet. ref'd).

Guyger testified she intended to kill Jean when she shot him. In addition, the State introduced evidence that Jean was a living human being—an individual—whose death was caused by the gunshot wound inflicted by Guyger. Accordingly, legally sufficient evidence supports the jury's murder verdict. TEX. PEN. CODE § 19.02(b)(1), (2); *see Clayton*, 235 S.W.3d at 778–79. Guyger bore the burden of producing evidence supporting each of her defensive issues, while the State retained the burden of persuasion to disprove those defenses beyond a reasonable doubt. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

## A.    Mistake of Fact

"It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE § 8.02(a). Thus, this defense applies when the defendant's mistaken belief, if accepted as true, negates the culpable mental state for the crime charged. *Granger v. State*, 3 S.W.3d 36, 41 (Tex. Crim. App. 1999). The defense "applies only with respect to elements that require proof of a culpable mental state." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013). If the evidence raises the defense, "whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence," the trial court should provide the instruction. *Granger*, 3 S.W.3d at 38. Thus, in this case, mistake of fact would apply if Guyger mistakenly formed a reasonable belief that negated her intent to kill Jean.

We differentiate mistake of fact—a defense—from justification. Justification depends on the circumstances giving rise to the challenged conduct, and the reasonableness of the defendant's belief that the conduct is immediately necessary to avoid imminent harm.

> Conduct is justified if: (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law

10

proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear."

TEX. PEN. CODE § 9.22. For instance, justification excuses the use of force against another person "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PEN. CODE § 9.31(a). As such, Guyger would have been justified in shooting Jean if she had formed a reasonable belief that doing so was necessary to avoid imminent harm, as we discuss below.

As the State points out, a case from our sister court, *Maupin v. State*, provides insight into the proper analysis in this case. *See Maupin v. State*, 930 S.W.2d 267, 268 (Tex. App.—Fort Worth 1996, pet. ref'd). Maupin was convicted of injury to the elderly following an incident in which he repeatedly threw and pushed a woman to the ground several times, causing her bodily injury. *Id.* As with the murder charge against Guyger, the crime with which Maupin was charged—injury to the elderly— turned on the intent to cause the result of the crime. *Id.* ("it is the intent to cause the result, the bodily injury, that is the gravamen of the offense."). Maupin asserted that his mistaken belief that the complainant was burglarizing his home warranted a mistake of fact instruction refused by the trial court. *Id.* But the court of appeals affirmed the trial court, concluding evidence of a potential burglary failed to negate Maupin's intent to cause bodily injury, and at best raised the defense of protection

11

of property. *Id.* No evidence suggested "Maupin was mistaken about whether the force he used would cause bodily injury." *Id.*

In addition, *Rocha v. State* provides a particularly apt comparison. *See Rocha v. State*, No. 14-10-00569-CR, 2012 WL 1154306, at *9 (Tex. App.—Houston [14th Dist.] Apr. 5, 2012, pet. ref'd) (mem. op., not designated for publication). Rocha was an off-duty police officer convicted of aggravated assault with a deadly weapon arising from an altercation outside his home. *Id.* at *2–5. On appeal, Rocha complained the trial court erred in refusing his mistake of fact instruction based on Rocha's testimony about his mistaken belief that Dunham, the victim, was "armed, was dangerous, or was preparing to attack, [or] assault [Rocha]." *Id.* at *9. In affirming the trial court's refusal to give the instruction, the court observed the facts about which Rocha was mistaken did not negate the "culpable mental element of aggravated assault." The court reasoned as follows:

> Appellant does not dispute that he intentionally or knowingly pointed the rifle at Dunham to place him in fear of imminent bodily injury. Instead, appellant's alleged mistaken beliefs were merely facts relevant to whether he was justified in intentionally or knowingly pointing the rifle at Dunham to create such fear of imminent bodily injury; i.e., whether he acted in self-defense based on a reasonable belief such force or threat of force was immediately necessary to protect himself against Dunham's use or attempted use of unlawful force.

*Id.* at *10.

In contrast, the court of criminal appeals determined in *Granger* that the trial court erred in refusing the appellant's requested mistake of fact instruction where

12

the evidence demonstrated appellant had killed a person by shooting into a car but also testified that, at the time he fired the shots, he believed the car was unoccupied. *Granger*, 3 S.W.3d at 37–39. "'When an accused creates an issue of mistaken belief *as to the culpable mental element of the offense*, he is entitled to a defensive instruction of 'mistake of fact.'" *Id.* at 41 (emphasis added) (quoting *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991)).

Here, Guyger asserts her mistaken beliefs that she had entered her own apartment and that Jean was an intruder negate her culpable intent to commit murder because "although she intentionally and knowingly caused Jean's death, she had the right to act in deadly force in self-defense" under penal code section 9.32(b), and "deadly force was immediately necessary and reasonable under the circumstances." However, as in *Rocha* and *Maupin*, the mistaken facts upon which Guyger relies are relevant only to whether Guyger was justified in shooting Jean. Guyger's right to act in self-defense, if applicable, did not negate her intent to kill Jean; self-defense instead would have *justified* the shooting.

In this regard, Guyger's brief highlights "48 distinct factual points" which she contends show her "clear mistake of fact" and her reasonable conduct under the circumstances. Those points include the following: her fatigue; talking on the phone when she mistakenly parked on the unmarked but wrong floor of the garage; missing visual cues distinguishing the fourth floor from the third; the unlatched door that she

13

was able to open even though her key fob did not unlock it; the dim lighting in the apartment and floor plan identical to her own apartment; and her training to shoot to kill when she believed she was in mortal danger. None of these points, however, speak even remotely to Guyger's intent to kill. Instead, each fact relates only to whether she was justified in defending herself because she believed she was in her own apartment and that Jean was an intruder. Thus, rather than conclusively proving her mistake of fact defense, the evidence here demonstrates the mistake of fact instruction was not warranted because no evidence negated Guyger's intent to kill Jean when she shot him.[1] We conclude the hypothetically correct jury charge should not have included a mistake of fact instruction. Accordingly, the mistake of fact issue is not part of our analysis of the sufficiency of the evidence to support Guyger's murder conviction. *See Malik*, 953 S.W.2d at 240.

## B. Self-Defense

Guyger also argues that a reasonable jury could not have rejected self-defense as a justification for her use of deadly force. Acquittal premised on self-defense required Guyger to produce evidence that she reasonably believed deadly force was

---

[1] We decline Guyger's invitation to rely on a decision from the United Kingdom's High Court of Justice, *Jaggard v. Dickinson*, [1981] 72 CR. App. R. 33 (Eng.). In addition to lacking precedential value, as observed by the State, the defendant in that case did not rely on mistake of fact as a defense for having damaged a property at an address she mistakenly believed to be a different address. Rather, the *Jaggard* defendant relied on a British statute providing a "lawful excuse" based on her belief that the property owner had consented to the damage under which the reasonableness of the defendant's belief was irrelevant. *Id.* at 35–36.

immediately necessary to protect herself from Jean's use or attempted use of unlawful force. *See* TEX. PEN. CODE §§ 9.31(a), 9.32(a)(1), 9.32(a)(2). An actor's belief that deadly force was immediately necessary is presumed to be reasonable if the actor:

> (1) knew or had reason to believe that the person against whom the deadly force was used:
>
>> (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
>>
>> (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
>>
>> (C) was committing or attempting to commit an offense described by Subsection (a)(2)(B).
>
> (2) did not provoke the person against whom the force was used; and
>
> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PEN. CODE § 9.32(b).

Under these provisions, the jury did not need to find that Jean was using or attempting to use unlawful deadly force for Guyger's right of self-defense to exist. It could determine instead that she reasonably believed, from her standpoint at the time of the shooting, "that deadly force, when and to the degree used . . . was immediately necessary to protect [herself] against the use or attempted use of

15

unlawful deadly force" by Jean. *Id.*; *Jones v. State*, 544 S.W.2d 139, 142 (Tex. Crim. App. 1976).

In making this argument, Guyger relies on her mistaken belief that she was in her own apartment to support the reasonableness of her belief that Jean posed an imminent threat. Mistake of fact, however, plays no role in self-defense—the former addresses Guyger's culpable mental state; the latter addresses the circumstances and reasonableness of Guyger's conduct. Guyger's argument thus bootstraps mistake of fact to reach the section 9.32(b) presumption of reasonableness. As discussed below, we conclude sufficient evidence defeated the presumption and also supports the jury's rejection of this defense because a reasonable jury could have determined Guyger's belief that deadly force was immediately necessary was not reasonable.

The jury could reasonably have determined beyond a reasonable doubt that Jean had not unlawfully and with force entered Guyger's occupied home or attempted to murder her.[2] Indeed, Guyger points to no evidence suggesting either scenario occurred. Instead, she relies on her *mistaken belief* that she was in her own apartment. The jury's rejection of Guyger's self-defense argument finds ample

---

[2] We omit discussion of beliefs premised on vehicles or places of business since no one disputes that all relevant events occurred at Jean's apartment. *See* TEX. PEN. CODE §§ 9.31(a), 9.32(b)(1)(A), 9.32(b)(1)(B). Likewise, because Guyger testified only that she believed Jean intended to kill her, we omit discussion of any efforts to remove Guyger from her home, attempted aggravated kidnapping, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *See* TEX. PEN. CODE §§ 9.31(a)(1)(B), 9.31(a)(1)(C). 9.32(b)(1)(B), 9.32(b)(1)(C).

support in the record. It is undisputed that Jean was in his home and was not attempting to unlawfully enter Guyger's apartment. Further, Guyger admitted that she could have taken a position of cover and concealment while she called for backup rather than shooting Jean. This admission was buttressed by the testimony of Officer Lee. In his testimony, Lee told the jury that if he came across a burglar while off duty and was safely able to take a position of cover and concealment, he would use his take-home radio to call for help rather than call 911. He explained the radio connected directly to dispatch and thus provided faster help since the 911 call would be delayed by the transfer to dispatch. He also testified that, when responding to a burglary call in which he had not yet entered the premises, for his safety and that of the person inside, his training mandated taking a position of cover and concealment rather than entering alone. In a burglary situation in which he had already entered the premises but had the option of safely repositioning to cover and concealment, he would likewise do so rather than shooting the intruder. He also testified that, if there were a burglar or other intruder in his home, he would allow that person the opportunity to surrender. He explained that in intense situations where another person posed a threat, he focused on the suspect's hands to determine whether the suspect held an item that could cause bodily harm, and in those situations it was important to determine where the suspect's hands were.

Other evidence also supports the jury's rejection of self-defense. This evidence includes the conflicting evidence as to whether Jean was seated or rising from a sitting position rather than standing and moving quickly towards Guyger; the conflicting evidence as to whether Guyger demanded that Jean show his hands[3]; the absence of any pockets in which Jean's hands might have been concealed; the ambiguous nature of Jean's "hey, hey, hey" exclamation; and the lack of evidence suggesting Jean held a weapon. *See Braughton*, 569 S.W.3d at 610 (jury could rationally have rejected appellant's "reason to believe" decedent was committing or attempting to commit robbery or murder given conflicting evidence and jury's resolution of factual disputes); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (concluding a rational jury could have found beyond a reasonable doubt appellant did not act in self-defense where the victim was unarmed when he lunged at appellant, appellant said at the scene that the shooting occurred accidentally, and the evidence showed hammer on weapon had to be fully cocked to fire); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (jury may choose to believe or not believe the witnesses, or any portion of their testimony). On this record, we conclude the evidence was legally sufficient to support the jury's rejection of

---

[3] Although Guyger testified she told Jean to show his hands and he did not show his hands, other witnesses including Bharathamarnath Madamanchi, Taydra Jones, and Whitney Hughes testified they heard two shots but did not hear Guyger tell Jean to show his hands.

Guyger's assertion of self-defense. We overrule Guyger's first issue. In reaching this conclusion, we need not address the State's cross-point.[4]

## II.    Criminally Negligent Homicide

In her second issue, Guyger contends that we should acquit her of murder, convict her of criminally negligent homicide, and remand the case for a new punishment hearing. She asserts that if she was not reasonable in her mistake that she was in her own apartment and also not reasonable in believing deadly force was immediately necessary to protect herself from Jean, then she was guilty only of criminal negligence.

Guyger's mental state with respect to the result of her conduct—Jean's death—determines the applicable offense. *See Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death."). Awareness that certain conduct will create a substantial and unjustifiable risk that death will result gives rise to manslaughter. TEX. PEN. CODE §§ 6.03(c), 19.04; *Schroeder*, 123 S.W.3d at 400–01. Lack of such awareness differentiates manslaughter from criminally negligent homicide. *Harris v. State*, No.

---

[4] *See* TEX. R. APP. P. 47.1; *see also Pfeiffer v. State*, 363 S.W.3d 594, 601 (Tex. Crim. App. 2012) ("[i]f the defendant is granted no relief and no retrial will therefore be held, the State will not be able to benefit from a favorable decision on its cross-points of error."); *Seghelmeble v. State*, 390 S.W.3d 576, 582–83 (Tex. App.—Dallas 2012, pet. ref'd) (appellate court may not address cross-issue "in which the State merely requests a directive as to language or reasoning of the lower court that does not impact the ultimate decision.") (quoting *Pfeiffer*, 363 S.W.3d at 601 n.32).

05-96-01531-CR, 1999 WL 562708, at *6 (Tex. App.—Dallas Aug. 3, 1999, pet. ref'd) (op. on reh'g) (not designated for publication) ("Either the actor is aware that his conduct bears a risk of unintended death, or he is not so aware. The presence or absence of that awareness determines whether the offense is manslaughter or criminally negligent homicide."). Failing to perceive that certain conduct creates a substantial and unjustifiable risk of death through a gross deviation from the reasonable standard of care exercised by ordinary people gives rise to criminally negligent homicide. *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012); TEX. PEN. CODE §§ 6.03(d), 19.05. The conscious objective or desire to cause death, or awareness that certain conduct is reasonably certain to cause death, gives rise to murder. TEX. PEN. CODE §§ 6.03(a), 19.02(b); *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983).

Rather than her intent to cause the result of her conduct—her intent to kill Jean by shooting him—Guyger relies on certain *circumstances* leading to her conduct. In asserting she did not consciously create or perceive the risk that Jean would be killed, she points to the confusing layout of the apartment complex, the poor assembly or construction of the apartment doors which enabled them to remain unlocked even if closed, and her failure to notice the "clues"[5] in the hallway

---

[5] Guyger identifies these clues as a large vase in the hallway, Jean's red doormat, and the apartment numbers to the right of the door. Although, as noted above, such circumstances are irrelevant to Guyger's mental

20

indicating she was on the wrong floor.  But her perception of circumstances creating the series of events here has no bearing on whether she acted intentionally or knowingly or instead acted with criminal negligence.  The evidence is undisputed that Guyger intended the result of her conduct or acted knowingly with respect to the result of her conduct because she testified she intended to shoot and kill Jean. That she was mistaken as to Jean's status as a resident in his own apartment or a burglar in hers does not change her mental state from intentional or knowing to criminally negligent.  We decline to rely on Guyger's misperception of the circumstances leading to her mistaken beliefs as a basis to reform the jury's verdict in light of the direct evidence of her intent to kill.  *Compare Salinas v. State*, 644 S.W.2d 744, 746 (Tex. Crim. App. [Panel Op.] 1983) (presuming "appellant was aware of the risk of injury or death by having a loaded, cocked pistol and exhibiting it"); s*ee also, e.g., Britain v. State*, 412 S.W.3d 518, 521 (Tex. Crim. App. 2013) ("appellate court should not render a judgment of conviction for a lesser-included offense unless there is proof beyond a reasonable doubt of all elements of the lesser-included offense.").  As previously discussed, legally sufficient evidence supports the jury's verdict finding Guyger guilty of murder.  We overrule her second issue.

---

state, we observe nonetheless that Guyger omits discussion of additional circumstances, for instance choosing not to retreat, take cover, and call for backup, which are of equal weight to the clues she discusses.

We overrule Guyger's appellate issues. Accordingly, we affirm the trial court's judgment.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

191236F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

AMBER RENEE GUYGER,
Appellant

No. 05-19-01236-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F18-00737-Q.
Opinion delivered by Chief Justice
Burns. Justices Myers and Partida-
Kipness participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered August 5, 2021